## STATE v. FRANCIS A. WHEELER AND JULIUS H. WHEELER.

1. The act entitled " An act to prevent the wilful pollution of the waters of any of the creeks, ponds or brooks of the state," approved April 21st, 1876, as amended by the supplement approved February 27th, 1880, is designed to prohibit the pollution of the waters of any creek, &c., used to supply any reservoir for distribution for public use. The offence created by the act is committed when offensive matter is deposited in such waters calculated to make them impure at the place of deposit, although the impurity may not, in fact, appreciably affect the waters when arrived at the reservoir.

2. Under such construction the act is not within the prohibition of the constitution against the appropriation of private property for public use without compensation. Although it may limit the beneficial use of private property, it is not an exercise of the right of eminent domain, but only a police regulation, forbidding certain specified uses of private property because such uses tend to the common injury of the citizens of the state, and it is sustainable as a proper exercise by the legislative authorities of the police power vested in them.

3. When the question whether evidence offered for the defence was admissible or not, depended upon what had been the course of proof on the part of the state, in order to take advantage of an erroneous exclusion of the evidence, the bill of exceptions should show that such evidence had been given on the part of the state as made the evidence offered by defence competent. Upon a writ of error this court can only look at the record and the bills of exception.

State v. Wheeler.

In error to the Essex Oyer and Terminer.

Argued at November Term, 1881, before BEASLEY, CHIEF JUSTICE, and Justices SCUDDER, REED and MAGIE.

For the plaintiffs in error, *E. C. Harris.*

For the state, *J. P. Stockton, Attorney-General.*

The opinion of the court was delivered by

MAGIE, J.   The writ of error in this case brings up for review the conviction of the plaintiffs in error upon an indictment found in the Essex Oyer and Terminer and handed down and tried in the Essex Sessions.   The indictment was framed upon the act entitled " An act to prevent the wilful pollution of the waters of any of the creeks, ponds or brooks of the state," approved April 21st, 1876, as amended by a supplement thereto approved February 27th, 1880.   *Pamph. L., p.* 61.   The first section of the act as so amended provides that if any person or persons shall throw, cause or permit to be thrown into any reservoir or into the waters of any creek, pond or brook of this state, the waters of which are used to supply any aqueduct or reservoir for distribution for public use, any carcass of any dead animal or any offal or offensive matter whatsoever, calculated to render said waters impure, or to create noxious or offensive smells, or shall connect any water-closet with any sewer or other means whereby the contents thereof may be conveyed to and into such creek, pond or brook, or shall so deposit or cause or permit to be deposited any such carcass, offal or other offensive matter, that the washing or waste therefrom shall or may be conveyed to and into any creek, pond, brook or reservoir, such person or persons shall be deemed guilty of a misdemeanor, &c.

Upon the argument, a printed book, purporting to contain the evidence and the charge of the court below, was laid before us.   It is no part of the record nor of the bills of exception. There is nothing to make it a part of the case, and the court

cannot consider it in deciding the questions here involved. We must be restricted to the record returned with the writ of error and the bills of exception signed in the court below.

The true construction of the section of the act above quoted was one of the subjects discussed by counsel. The question was raised in the court below by offers to prove that the waters of the brook, in which offensive matters were charged to have been put, became purified and inoffensive before reaching the reservoir of which its waters formed part of the supply. Such evidence was rejected and the rejection duly excepted to. The defendants also requested the court to charge the jury that, unless their acts were calculated to render the water as supplied to such reservoir impure or offensive, they could not be convicted, and excepted to the court's refusal to so charge. Upon this subject the court substantially charged that it was immaterial whether the offensive matter put in the brook actually affected the water in the reservoir or not, and to this part of the charge an exception was taken.

It is now contended that the court below erred in the construction of the act in question, and further, that if such construction is the correct one, the act deprives an owner of property of its use without compensation, and so is not within the power of the legislature.

I entertain no doubt that the court below, in the rulings above referred to, correctly construed this act. The question turns on the meaning and relation of this clause, viz., "calculated to render said waters impure." What "waters" are thereby intended—those of the reservoir, where waters are collected for distribution for public use, or those of the creek, pond or brook, the waters of which supply such reservoir? The grammatical connection of the clause is only consistent with the latter meaning. The other portions of the act unmistakably indicate that such was the meaning intended by the legislature. The section above quoted makes punishable the mere connection of a water-closet with the waters of such creek, &c., whereby its contents may be discharged therein, without reference to whether the waters of the reservoir were

thereby polluted. So it punishes the deposit of offensive matters where they may waste into the waters of such creek, &c. The second section of the same act makes it the duty of the owner or occupant of land whereon offensive matter is, to bury the same not within two hundred feet from such creek, &c. The title of the act is inconsistent with any limited construction. The whole act plainly shows a design to protect from pollution the waters of creeks, &c., used as the feeders for reservoirs for public use, without any reference to whether such pollution in fact appreciably affects the waters when arrived at the reservoir.

Nor does such a construction render this act objectionable. The design of the act is not to take property for public use, nor does it do so within the meaning of the constitution. It is intended to restrain and regulate the use of private property so as to protect the common right of all the citizens of the state. Such acts are plainly within the police power of the legislature, which power is the mere application to the whole community of the maxim, " sic utere tuo, ut alienum non lædas." Nor does such a restraint, although it may interfere with the profitable use of property by its owner, make it an appropriation to a public use so as to entitle him to compensation. *Commonwealth* v. *Alger*, 5 *Cush.* 53. *Commonwealth* v. *Tewksbury* 11 *Metc.* 55. Of the right of the legislature thus to restrain the use of private property in order to secure the general comfort, health and prosperity of the state, " no question ever was or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned." Redfield, C. J., *in Thorpe* v. *Rutland R. R.*, 27 *Vt.* 149. The same view has been always held in this state, and notably in the case of *State* v. *Common Pleas of Morris*, 7 *Vroom* 72. It was also there held that the extent to which such interference with the injurious use of property may be carried, is a matter exclusively for the judgment of the legislature when not controlled by fundamental law.

Nor is there anything to render such legislation objectionable because in some instances it may restrain the profitable

use of private property, when such use in fact does not directly injure the public in comfort or health. For to limit such legislation to cases where actual injury has occurred, would be to deprive it of its most effective force. Its design is preventive, and to be effective it must be able to restrain acts which tend to produce public injury. Many instances of such an exercise of this power can be found. The state regulates the use of property in intoxicating liquors by restraining their sale, not on the ground that each particular sale does injury, for then the sale would be prohibited, but for the reason that their unrestricted sale tends to injure the public morals and comfort. The state is not bound to wait until contagion is communicated from a hospital established in the heart of a city—it may prohibit the establishment of such a hospital there, because it is likely to spread contagion. So the keeping of dangerous explosives and inflammable substances, and the erection of buildings of combustible materials within the limits of a dense population, may be prohibited because of the probability or possibility of public injury. Such instances might be indefinitely multiplied, but these are sufficient to illustrate this case. The object of this legislation is to protect the public comfort and health. For that purpose the legislature may restrain any use of private property which tends to the injury of those public interests. That the pollution of the sources of the public water supply does so tend, no one will deny.

It was further insisted on the argument that the indictment was insufficient because it failed to state the particular aqueduct or reservoir supplied by the waters of the brook charged to have been polluted. The language of the indictment is as follows, viz., that F. A. W. and J. H. W., of, &c., on, &c., at, &c., within the jurisdiction, &c., "did throw and cause to be thrown into the waters of a certain creek and brook then and there situate and known as Toney's brook, the waters of which were then and there used to supply a certain aqueduct and reservoir for distribution for public use, certain offal and offensive matter calculated to render said waters impure," &c.

I do not think this objection can avail the plaintiffs in error. Upon the construction we have given the act, the charge of the indictment seems sufficient. The gist of the offence is the depositing in the waters of a brook, &c., used to supply an aqueduct or reservoir, &c., offensive matter calculated to make the waters of the brook impure. The clause respecting the aqueduct or reservoir is only necessary to identify the brook; &c., as one of those in respect to which the crime could be committed. It is a matter of entire indifference to the person charged whether the waters supply one or another aqueduct or reservoir, If they supply any aqueduct or reservoir the crime is completely described. But if there were any doubt on this point, I cannot perceive how this omission could have prejudiced the parties from maintaining their defence upon the merits, and, consequently, the judgment could not be reversed if this was erroneous. *Rev.*, *p.* 284, § 89.

A careful examination of the bills of exception discloses nothing that requires further consideration, except the alleged error of the court below in rejecting testimony offered by the plaintiffs in error to show that at or above the point where they discharged matters from their mill, offensive matters were discharged into the same brook by others, or that the brook was polluted above. Whether evidence of this sort was admissible depended upon what had been proved up to that time. If the state had then proved the discharge into the brook of offensive matters by the defendants in the indictment, I cannot perceive how such evidence was competent. It could be no defence to show that others had committed the same offence. But if the state had only proved the discharge into the brook by the defendants of some substance the nature of which was not disclosed, and relied on proof that the waters below the point of discharge became noxious and offensive, to establish the offensive character of the discharge, then such evidence as was offered would be competent and proper. But the bill of exceptions does not disclose how the evidence then stood, and we are unable to decide whether the rejection of this evidence was erroneous

or not. We must assume no error was committed by the court below, unless such error can be perceived in the case as brought before us.

The judgment below ought to be affirmed, with costs.